## UNITED STATES v. SWIFT & CO. et al.

### No. 9838 Criminal.

District Court, D. Colorado.

Sept. 25, 1943.

James McI. Henderson and George B. Haddock, Sp. Assts. to Atty. Gen., of Denver, for plaintiff.

· Kenneth W. Robinson, John R. Coen, Henry W. Toll, Robert G. Bosworth, Clyde C. Dawson, Jr., and Harry S. Silverstein, all of Denver, for defendants.

SYMES, District Judge.

In case No. 9513 in this court, 46 F.Supp. 848, the Government indicted the same defendants—dealers in lambs on the Denver market—who are defendants in this proceeding for the same alleged conspiracy to violate the Sherman Anti-Trust Law, Tit. 15 U.S.C.A. § 1. After a hearing this court dismissed the indictment on the ground that the alleged agreement and practices charged did not in any way affect the price of fat lambs, or the number of fat lambs, raised or produced, and did not lessen the flow of fat lambs in interstate commerce. Thereupon the Government took a direct appeal under the Criminal Appeals Act, 18 U.S.C.A. § 682, to the Supreme Court.

The Supreme Court held (United States v. Swift & Co., 318 U.S. 442, 63 S.Ct. 684, 87 L.Ed. ——), it was unable to entertain the appeal for the reason that under the statute its "jurisdiction is restricted to review of a decision or judgment based upon the invalidity or construction of the statute on which the indictment is founded". The Supremê Court construed this court's decision to be that the general allegations with respect to the effect of the alleged agreement on interstate commerce were insufficient, and: "It [the district court] thus placed its decision in part at least on the inadequacy of the allegations of the indictment, * * * to charge that the conspiracy or agreement affected commerce within the meaning of the Sherman Act. These we think were rulings upon the sufficiency of the indictment as a matter of pleading, the correctness of which cannot under the statute be reviewed here on direct appeal from the district court". The Court therefore remanded the case to the

Circuit Court of Appeals for this Circuit, which it stated had authority to pass upon the construction of both the indictment and the statute. The United States thereupon dismissed the indictment and filed the information in this case, to wit, No. 9838.

Motions and demurrers attacking its sufficiency having been filed, the same came on and were fully argued by all parties on September 10, 1943.

The question to be resolved is: Does the indictment state an offense? A comparison of the information with the indictment indicates an attempt to overcome the objections that the court found to the indictment that resulted in the dismissal referred to.

The gist of the complaint in the indictment was that the conspirators—all members of the Denver Livestock Exchange—agreed among themselves, in accordance with a rule of the Livestock Exchange, to make all their purchases of lambs solely at the Denver Union Stock Yards and refrain from purchasing fat lambs in the field; that is, directly from the producer as formerly—a practice which consisted of sending salesmen to the individual ranches or farms where the fat lambs are produced. It was claimed that this agreement constituted a monopoly in restraint of trade in violation of the Sherman Anti-Trust Act.

This court held, in upholding a demurrer to the indictment, that there was no claim by the Government that the price of fat lambs on the Denver market, or elsewhere, had been in any way affected, or that any monopoly had been created, or that this practice had in any way affected the price of fat lambs, or the flow of fat lambs into this or any other market anywhere in the United States, or had affected the number of lambs produced for sale in any way. The court pointed out that in that case there was no claim that competition was affected, because when the defendants bought lambs in the Denver market they actually competed with each other and other buyers, and the producer had the advantage of that competition, which he does not have when dealing with a single salesman on his farm.

In this information the Government has shifted its ground and rests its charge mainly on what is known as the "turn system", which it claims has been in existence at the Denver livestock market as a method of selling and buying fat lambs for over three years, and "which has been followed and adhered to by all of the defendants throughout its existence". That this so-called turn system was initiated and made operative by members of the Denver Livestock Exchange and the associated livestock commission firms.

In the indictment (par. 14), the turn system was referred to but not emphasized and it was not described in detail as it now is in this information. In brief, it is as follows: Yearly the commission firms to whom fat lambs are consigned for sale at the Denver Union Stock Yards, are divided into four groups on the basis of the number of fat lambs received by said firms during the preceding year, so that each of the four groups is composed of commission firms whose combined receipts total 25% of the total receipts of fat lambs by commission firms at the market during the preceding year. Corresponding to these four groups, four buyers of sheep are recognized, to whom are allotted "turns". Upon the arrival of fat sheep at the market consigned to the commission firms they are placed in pens assigned by the Stock Yards Company to said firms, and each of the four so-called "turn" holders is given the first turn, or opportunity to buy the fat lambs in the pens of the commission firms. It is alleged that the fat lambs thus consigned to commission firms, and subject to this turn system, include practically all the fat lambs for sale at this market at any one time.

On any given market day each of the four turn holders or buyers—the defendants Swift & Company, Armour & Company, Louis J. Reed, and the commission firm of Merrion & Wilkins—hold turns in the capacity of order buyers. Louis J. Reed was engaged by the defendant, the Cudahy Packing Company, as its order buyer. The rules of the Livestock Exchange provide that no order buyer shall have or hold a turn, except those holding memberships in the Livestock Exchange.

It is then charged that on any given market day the four turn holders are given the first turn, or opportunity, to buy all the fat lambs in the pens of the commission firms in one of the four groups, and have the second, third and fourth turns respectively for fat lambs held by the other three groups of commission firms. The order of turns held by each group of commission men is rotated daily. The result is each of the four turn holders is given first turn

on 25% of the fat lambs held by the commission firms, second turn on 25%, third turn on 25% and fourth turn on 25%; so that the four turn holders have a turn or opportunity to buy all the fat lambs held by all the commission firms before any other buyer is permitted to make an offer, or attempt to purchase.

The holder of the first turn is given the exclusive right to bid on the sheep held by the commission men in his group, from the opening of the central market until eleven o'clock in the morning, and the second, third and fourth turn holders are given 30 minutes each to bid on all lambs left unsold in the preceding turns. The seller has only one offer, or bid, for consideration at any single time. If the bid is accepted the deal is closed and the lambs cannot subsequently be offered or sold to a higher bidder. If the holder of a turn leaves the lambs without buying them his bid is withdrawn when he leaves, and the seller cannot thereafter accept his bid. This system bears no relation to an auction, because the seller does not receive simultaneous bids from which he can pick the highest.

Furthermore, it is charged that as part of the system buyers other than the four turn holders are required to wait until after the four turn holders have negotiated with the seller before any other buyers are permitted to bid on the lambs held by these commission men, and then only to bid on lambs remaining after the turn holders have completed their turn.

█ In the consideration of this question, according to Appalachian Coals, Inc., v. United States, 288 U.S. 344, at page 360, 53 S.Ct. 471, at page 474, 77 L.Ed. 825: "Realities must dominate the judgment. The mere fact that the parties to an agreement eliminate competition between themselves is not enough to condemn it".

And, 288 U.S. at page 361, 53 S.Ct. at page 474, 77 L.Ed. 825: "The question of the application of the statute is one of intent and effect, and is not to be determined by arbitrary assumptions". And, 288 U.S. at page 374, 53 S.Ct. at page 479, 77 L.Ed. 825: "Putting an end to injurious practices, and the consequent improvement of the competitive position of a group of producers is not a less worthy aim and may be entirely consonant with the public interest, where the group must still meet effective competition in a fair market and

neither seeks nor is able to effect a domination of prices".

█ An objective scrutiny of this turn practice indicates that it stifles competitive bidding for fat lambs on the market as charged. First, because the bidding is limited to four bidders, each one of whom is in turn given the exclusive right to make a bid on all the lambs that any particular group of commission men have in their pens for sale. The man with the first turn has until eleven o'clock in the morning to make his bid, and if the seller does not accept it it is automatically withdrawn before he has an opportunity to compare it with the second, third or fourth bids he may receive from the other turn holders, and to select the highest bids. While it is true that outside bidders are permitted to bid, they may not do so, according to the allegations of the indictment, until the four turn holders have negotiated with the seller and not made a purchase.

It is charged that outside buyers, who pay a premium of ten cents a hundredweight over and above the market, are permitted to buy lambs ahead of the turn holders. Further, an outside buyer may place orders with two or more buyers, and upon paying their commission or fee, secure their services in bidding in turn. In the latter instance his order is made subordinate to the conflicting orders of the regular customers that the order buyer represents, until the orders of the regular customers are filled. As an example it is charged that orders from the Cudahy Packing Company are given priority by Louis J. Reed—a buyer—over orders from other buyers, as long as the orders are for the same or similar quality and grade of lambs.

The reality of the situation demonstrates that competition is stifled and that the abolition of this turn system would improve the competitive position of the producers of fat lambs who sell on the Denver market. Furthermore, the effect of the turn system is that these turn buyers do not have to meet any effective competition in a fair market, for the simple reason that when they make a bid, the seller or producer must accept or reject it without the opportunity of considering or comparing it with a bid from any other buyer.

This practice, of course, exists and must be adjudged independently of the question of country purchases passed upon in the

other suit. We cannot subscribe to the allegation in the indictment of the advantages of country buying over sales made at the central market were this practice abolished.

■ As was said in the Apex Hosiery case, Apex Hosiery Co. v. Leader, 310 U. S. 469, 499, 60 S.Ct. 82, 84 L.Ed. 1311, 128 A.L.R. 1044, the statute condemns restraints which are unreasonable or undue, and in the tobacco case, United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663, that the Anti-Trust Act condemns contracts or argeements which operate to the prejudice of the public interest. Page 500 of 310 U.S., 60 S.Ct. at page 996, 84 L.Ed. 1311, 128 A.L.R. 1044: "* * * unduly restricting competition, or unduly obstructing the due course of trade". And: "* * * it is said that the restraints, actual or intended, prohibited by the Sherman Act are only those which are so substantial as to affect market prices". Clearly a statement which applies to the instant case, when we consider that the seller of fat lambs on the Denver market must either accept or reject each bid as it is offered, without an opportunity to select the highest bid. Furthermore we bear in mind that the bidding is restricted to four bidders.

The natural result of this turn system is to directly restrain competition in the purchase of fat lambs on the Denver market. It might well be said that the action of these parties in ceasing country buying was to force the producer to ship his fat lambs to Denver and sell them subject to this turn system. Clearly it is a course of trade in the merchandising of fat lambs moving in interstate commerce that has the effect upon prices in the Denver market, and deprives the producers and consumers of the advantages of the free competition they are entitled to.

Unlike the other case, this self-imposed rule requiring the four buyers to bid in turn, and the seller to accept a bid before any other can be made—if at all—is clearly a restraint upon commercial competition in the marketing of fat lambs on this Exchange. The practice itself is open to the charge that the four buyers before making their bids can agree upon prices to be offered, and determine in advance which one of them shall make the highest bid and be enabled to fill his orders for fat lambs in a manner condemned by the Sherman Act and the decisions. The charge is (par. 15(c)): "The four turn holders are given the first turn or opportunity to buy the fat lambs in the pens of the commission firms. Normally, the fat lambs consigned to the commission firms and subjected to the turn system include practically all the fat lambs for sale at the central market at any given time".

The conspiracy part of the information (par. 20, subdivision (f)) alleges that defendants agree not to compete among themselves, or with others in the purchase of fat lambs. That they (i) require producers of fat lambs to market them pursuant to the turn system, and that the defendants agree (k) that all the fat lambs sold by the commission firms on the Denver market shall be sold "pursuant to the non-competitive 'turn system'". Clearly an unreasonable restraint, and a direct interference and stifling of competition—all to the harm of the producers of fat lambs and the public generally.

■ As pointed out in the Socony-Vacuum Oil Co. case (Sacony-Vacuum Oil Co. v. United States) 310 U.S. 150, at page 221, 223, 60 S.Ct. 811, at page 843, 84 L. Ed. 1129: "Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market * * *".

■ And any combination formed, and which has the effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity in interstate commerce, is illegal per se.

The conclusion is inescapable under the allegations that the turn system was a combination formed for the purpose of influencing prices, and that it caused them to be fixed—or contributed to that result—and that is sufficient to make the restraint of prices and competition unreasonable.

The demurrers and motions are overruled.