Frank A. BERIGAN et al., Petitioners,

v.

UNITED STATES of America and Ezra Taft Benson, Secretary of Agriculture, Respondents.

No. 15848.

United States Court of Appeals Eighth Circuit.

Aug. 13, 1958.

Alexander McKie, Jr., Omaha, Neb. (Barton H. Kuhns and Finlayson, McKie & Kuhns, Omaha, Neb., were with him on the brief), for petitioners.

Donald A. Campbell, Atty., U. S. Dept. of Agriculture, Washington, D. C. (J. Stephen Doyle, Jr., Atty., Dept. of Justice, and Neil Brooks, Asst. Gen. Counsel, U. S. Dept. of Agriculture, Washington, D. C., were with him on the brief), for respondents.

Before SANBORN, VOGEL and MATTHES, Circuit Judges.

VOGEL, Circuit Judge.

In this proceeding we are asked to review an order of the Judicial Officer of the United States Department of Agriculture acting for the Secretary of Agriculture, issued under the Packers and Stockyards Act, 1921, as amended (7 U.S.C.A., 1952 ed., § 181 et seq.). The proceeding was instituted by the issuance of an Order of Inquiry and Notice of Hearing by the Director of the Livestock Division, Agriculture Marketing Service, of the United States Department of Agriculture. For convenience, the parties will be designated here as they were in the Order of Inquiry—United States Department of Agriculture as complainant or the government, and Berigan Brothers Livestock Commission Company and the individual traders as respondents. The respondents named are (1) the partners of the Berigan Brothers Livestock Commission Company (hereinafter referred to as Berigan) and (2) individuals or firms operating as dealers in buying and selling livestock.

It was alleged in the Order of Inquiry that on specific occasions and at divers other times during the period from September 1, 1954, through November 8, 1955, the respondents engaged in and used an unfair and unjustly discrimina-

tory practice and device in connection with the marketing, buying and selling of stocker and feeder cattle in commerce in that the respondent dealers " * * * pursuant to an understanding or arrangement between themselves, flipped coins, or used other similar methods, to determine the 'order' or 'turn' in which they were to look at, bid on, and have the opportunity to buy stocker and feeder cattle consigned for sale on a commission basis to the Berigan Brothers Livestock Commission Company; the Berigan Brothers Livestock Commission Company recognized such 'order' or 'turn' system established by respondent dealers, acquiesced in it, and gave respondent dealers who won the 'flips' favored treatment and priority in connection with said market agency's sales of such consigned stocker and feeder cattle by showing such respondent dealers the stocker and feeder cattle, obtaining bids on such cattle from them, and selling the cattle to them in accordance with the 'order' or 'turn' determined and established by respondent dealers, instead of offering the cattle for sale to all interested buyers under open and free competitive conditions, thereby failing to render just and reasonable selling services to the consignors of the cattle; and respondent dealers who won the 'flips' knowingly accepted such favored treatment and priority from the Berigan Brothers Livestock Commission Company * * *."

It was also alleged in the Order of Inquiry that Berigan failed to render just and reasonable buying services in filling orders for the purchase of stocker and feeder cattle on a commission basis in that Berigan, instead of buying such cattle on the open market, bought a major portion of the stocker and feeder cattle from certain favored dealers who in many instances had originally purchased the same cattle from Berigan on the same day or a day or two before and such cattle were purchased at substantial mark-ups.

The Judicial Officer, acting for the Secretary, specifically found (1) that when more than three dealers flipped for turns only the dealers who won the first, second and third turns were permitted to remain in the sales alley; (2) that when dealers only were present, Berigan accepted the order or turns established by the dealers; and (3) that on numerous occasions when farmers and dealers were attempting to purchase livestock from Berigan, Berigan accepted the order established by the flip of the dealers, thereby discriminating against the farmers.

In addition, the Judicial Officer found that when Berigan purchased livestock on a commission basis that instead of purchasing the same on the open market, Berigan generally purchased from dealers at a mark-up in the price that the dealers had paid for the livestock and that accordingly Berigan failed to render reasonable buying services to its customers, in violation of the Act.

All respondents, that is, Berigan and the dealers, were found to have violated § 312(a) of the Act (7 U.S.C.A., 1952 ed., § 213(a)), which provides that:

"It shall be unlawful for any stockyard owner, market agency, or dealer to engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in connection with the receiving, marketing, buying, or selling on a commission basis or otherwise, feeding, watering, holding, delivery, shipment, weighing, or handling, in commerce at a stockyard, of livestock."

Berigan alone was found to have violated both of the following sections: § 304 of the Act (7 U.S.C.A., 1952 ed., § 205):

"It shall be the duty of every stockyard owner and market agency to furnish upon reasonable request, without discrimination, reasonable stockyard services at such stockyard: * * *."

Section 307 of the Act (7 U.S.C.A., 1952 ed., § 208):

"It shall be the duty of every stockyard owner and market agency to establish, observe, and enforce just, reasonable, and nondiscrimina-

tory regulations and practices in respect to the furnishing of stockyard services, and every unjust, unreasonable, or discriminatory regulation or practice is prohibited and declared to be unlawful."

Upon finding the violations as stated, the Judicial Officer held that inasmuch as the practice of determining turns to bid and buy by flipping coins was one of long standing and existed at six other major stockyards and because of other circumstances indicated in the record, that respondents' registrations should not be suspended but he did order that: "Each respondent shall cease and desist from engaging in the practices which he, or the partnership in which he was a member, has been found herein to have engaged in and which are found herein to be in violation of the act."

This court's jurisdiction is contained in 5 U.S.C.A. § 1032, which in part provides that:

"§ 1032. *Jurisdiction of courts of appeals*

"The court of appeals shall have exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of, all final orders * * * (b) of the Secretary of Agriculture made under the Packers and Stockyards Act, 1921, as amended, * * *."

The scope of judicial review of the findings and conclusions of an administrative agency, such as is involved here, is strictly limited.

5 U.S.C.A. § 1009(e) provides in part:

"So far as necessary to decision and where presented the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of any agency action. *It shall * * * (B) hold unlawful and set aside agency action, findings, and conclusions found to be * * (5) unsupported by substantial evidence in any case * * *.*" (Emphasis supplied.)

In National Labor Relations Board v. Link-Belt Co., 1941, 311 U.S. 584, 597, 61 S.Ct. 358, 365, 85 L.Ed. 368, the Supreme Court stated:

"As we stated in National Labor Relations Board v. Waterman Steamship Corp., supra, 309 U.S. [206] at pages 208–209, 60 S.Ct. [493] at pages 495, 496, 84 L.Ed. 704: ' * * * Congress has left questions of law which arise before the Board—but not more—ultimately to the traditional review of the judiciary. Not by accident, but in line with a general policy, Congress has deemed it wise to entrust the finding of facts to these specialized agencies. It is essential that courts regard this division of responsibility which Congress as a matter of policy has embodied in the very statute from which the court of appeals derived its jurisdiction to act.' *Congress entrusted the Board, not the Courts, with the power to draw inferences from the facts.* National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 576, 82 L.Ed. 831; National Labor Relations Board v. Falk Corp., 308 U.S. 453, 461, 60 S.Ct. 307, 311, 84 L.Ed. 396. *The Board, like other expert agencies dealing with specialized fields* (see Rochester Telephone Corp. v. United States, 307 U.S. 125, 146, 59 S.Ct. 754, 764, 83 L.Ed. 1147; Swayne & Hoyt v. United States, 300 U.S. 297, 304, 57 S.Ct. 478, 81 L.Ed. 659) *has the function of appraising conflicting and circumstantial evidence, and the weight and credibility of testimony.*" (Emphasis supplied.)

As we said in National Labor Relations Board v. United Biscuit Co., 8 Cir., 1953, 208 F.2d 52, 54:

"In this proceeding we are not called upon to weigh the evidence but only to examine it for the purpose of determining whether or not on the entire record the essential findings are sustained by substan-

tial evidence and in performing this function we must view the evidence in a light most favorable to the prevailing party. In Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 465, 95 L.Ed. 456, we are admonished by the Supreme Court that in this area of mixed fact and law, a court will not lightly disregard the overall appraisal of the situation by the Labor Board 'as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect.'"

■ Even though this court in a trial *de novo* might arrive at a different result, it may not substitute its judgment for that of an administrative agency presumably expert in its field. As this court said in Pittsburgh Plate Glass Co. v. National Labor Relations Board, 8 Cir., 1940, 113 F.2d 698, 701, affirmed 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251:

"It must be remembered that, within the limits of the jurisdiction conferred upon it, the power of a court or an administrative board to decide questions is not confined to deciding them correctly. Thompson v. Terminal Shares, 8 Cir., 89 F.2d 652, 655. A jury may decide incorrectly issues of fact, but if its verdict is within the evidence its mistakes of fact cannot be corrected on review. Elzig v. Gudwangen, 8 Cir., 91 F.2d 434, 444. And the determination by a legislative body of a debatable question which it has power to decide is not subject to judicial reexamination. United States v. Carolene Products Co., 304 U.S. 144, 154, 58 S.Ct. 778, 82 L.Ed. 1234."

This court therefore must confine its review to a determination of whether or not the Secretary's conclusions were supported by substantial evidence viewing the record as a whole.

In asking this court to review and vacate such cease and desist order, the respondents raise the following claims of error:

1. The Judicial Officer erred in finding that respondent traders who flipped coins or used other similar methods to determine the order or turn in which they were to look at, bid on and have an opportunity to buy stocker and feeder cattle consigned for sale on a commission basis to the Berigan Brothers Livestock Commission Company thereby violated § 312(a) of the Act (7 U.S.C.A., 1952 ed., § 213(a)).

2. The Judicial Officer erred in finding that Berigan recognized the "order" or "turn" system established by the dealers, acquiesced in it and gave the dealers who won the "flip" favored treatment and priority instead of offering the cattle for sale to all interested buyers under open and free competitive conditions, in violation of §§ 304, 307 and 312(a) of the Act (7 U.S.C.A., 1952 ed., § 213(a)).

3. The Judicial Officer erred in finding that Berigan, in filling orders for the purchase of cattle, failed to render just and reasonable buying services, in that Berigan instead of buying cattle on the open market bought a major portion from certain favored dealers who in many instances had originally purchased the same cattle from Berigan on the same day or a day or two before at substantial mark-ups, thereby violating §§ 304, 307 and 312(a) of the Act (7 U.S. C.A., 1952 ed., § 213(a)).

4. The Judicial Officer erred in entering a cease and desist order against respondents.

With these claims of error in mind, and limited as we are in our review, we have examined the record before us.

■ The principal issues here relate to the validity of the "turn system", as such term system was practiced in the purchase of stocker and feeder cattle by livestock dealers from Berigan. Berigan is engaged in the business of buying and selling livestock on commission at the Union Stockyards in Omaha, Nebraska,

and is duly registered under the provisions of the Packers and Stockyards Act as amended. The traders are engaged in the business of buying and selling livestock for their own account and each is duly registered as a dealer under the provisions of the Act.

At the Union Stockyards livestock are sold by private treaty rather than by auction; i. e., only one person at a time is permitted to examine and bid on livestock and the livestock are generally sold to the first person who bids a price which the commission man considers to be the market value. The selling of livestock by individual negotiation or private treaty with successive prospective buyers, as opposed to the auction system, is in use at all terminal stockyards. The process of selling livestock on a terminal market was described by Mr. Lee D. Sinclair, Chief of the Packers and Stockyards Division, as follows:

"It is the duty of a commission man when he receives a consignment to size them up, shape them, get them in the best condition that he can and then in his own mind determine what the value of the livestock is on the market that day at that time, and when he takes a buyer into his alley, regardless of who the buyer may be, it is his duty to sell to the buyer that first bids him his opinion of the market value of the livestock if he believes that is the best he can get on it that day. If the first man bids him the price that he thinks is right, he certainly has the right to sell to him and normally I expect he would. He has a right certainly of making up his mind as to what the livestock is worth. If he gets a bid equal to that he can sell it without question.

"A weak salesman may price his livestock a little high and let the bidders coming in kind of fix the market for him. I have seen instances where I believe that was happening. And if that salesman waits for four, five or six bidders to come in and doesn't lower his bid he

is likely to get lower than the market if he priced them right early in the morning."

The use of the private treaty system as so described is not questioned by the government as a proper method of selling livestock.

At the Omaha terminal the livestock dealers have for many years engaged in the practice of flipping coins to establish the order or turn in which they would look at and bid on stocker and feeder cattle there being held for sale. By such flipping of coins the dealers determine first, second and third turn among the dealers. All other dealers are required to leave the sales alley so that when the business of selling begins there are present the first three choices among the dealers plus the farmers or non-dealer buyers who are not allowed to engage in the coin flipping but who are there to make purchases of their own.

It was stipulated:

"* * * that at each of the public markets shown below, there is in operation a method of determining turns to bid somewhat similar, but with local market variations, to the method in effect at Omaha; and that such methods have been practiced for twenty years or more.

| | |
|---|---|
| Fort Worth, Texas | St. Joseph, Missouri |
| Oklahoma City, Oklahoma | Sioux City, Iowa |
| Kansas City, Missouri | Denver, Colorado" |

It is contended that coin flipping as well as other methods of determining turns by chance was originated for the purpose of keeping farmers and other non-dealer buyers from buying direct, thereby forcing them to buy from the dealers and pay the dealers' mark-up, and that the turn system among the dealers alone, whether by flipping coins or otherwise, discriminates against the farmers and non-dealers. It was also contended that the dealers, in order to enforce the acceptance of their turn system, engaged in the practice of "drydocking" commission firms which did not adopt it. "Drydocking" or boycotting amounts to an agreement among the dealers that they

will refrain from buying from a commission firm which refuses to recognize the turns they themselves establish. In other words, restriction of competition is the center of this controversy.

The respondents here argue that the flipping of coins system has been in force at the Omaha market since 1930; that winning the flip does not automatically entitle the winner to be the first to bid on certain pens of cattle, as against the off-the-market buyers or even as against other dealers, and that it is recognized by all parties that it is the right and the duty of the commission man to select from all buyers the one who will be first, second, third, etc., to whom he will show the livestock consigned to him for sale, whether it be an off-the-market buyer, the dealer who won the flip or any other dealer. It was claimed that coin flipping means nothing except within the dealers' organization and that all dealers recognized that the choosing of the prospective buyer is left to the seller—the commission man, and that the traders have no control over him whatsoever. Respondents argue:

> "If a commission man has the right to select any buyer he chooses out of a number at the head of his alley, it is difficult to see how flipping coins by the traders can control the commission man's selection as between traders and off-the-market buyers. If a commission man desires to discriminate in favor of traders as against farmer-feeders he can do so whether the traders flip or not by exercising his right to consistently take in a trader as first bidder in preference to a farmer-feeder."

The respondents' claimed errors (1) and (2) encompass three ramifications of the turn system at issue in this proceeding, viz.: (a) The requirement that if more than three dealers flip for turns, the dealers who do not win first, second or third turns must leave the market agency's sales alley; (b) the determination by the dealers of the order or turns in which they will look at and bid on

stocker and feeder livestock and the acceptance by the market agency of the order or turn established by the dealers; and (c) the same situation as in (b) with the additional circumstance that dealers are favored over farmers or other potential purchasers in accordance with the order or turns established by the dealers.

As to (a), the rules of the Omaha Livestock Traders Exchange, of which the dealer-respondents are members and by which rules they are bound, provide that after the coin flipping all buyers with the exception of those winning first, second and third turns shall leave the alleys. The record amply justifies the conclusion of the Judicial Officer that the dealers' rules were enforced and only the dealers winning the first three turns were permitted to remain in the sales alleys. The record further indicates that winning a turn by a dealer had a monetary value estimated at varying from a few cents per cwt. to as much as $3.50 per cwt.

We think it obvious that any method, rule or scheme which limits the number of buyers or prospective buyers and thereby increases the value of the position or turn of those not eliminated must have the effect of restricting competition and necessarily results in depressing the whole market.

The Judicial Officer's conclusion that the elimination of all but three dealers from a sales alley, thus limiting the number of prospective buyers, unreasonably restricts competition, is a sound conclusion, not contrary to law and one that is supported by substantial evidence in this record viewed as a whole.

■ (b) The Judicial Officer found that after the dealers had determined the order in which they would be allowed to look at and bid on livestock, and dealers not winning first, second or third place were required to leave the sales alley, that the order or turn so established by the dealers was accepted by Berigan. Here it is argued that winning the flip does not entitle the winner to be the first to bid, and that it is the right and duty

of the commission man to select from all buyers the one who will be first, second, third, etc. This argument lacks savor. The flipping of coins by the dealers among themselves to the exclusion of the farmers was not an idle pastime but had definite meaning and effect. The flipping of coins cannot be considered in a vacuum. If it meant nothing, why engage in such fruitless gestures? According to the rules and by-laws of the Omaha Livestock Traders Exchange, the method of flipping for turns was binding upon the members thereof and while not binding upon Berigan, the record justifies the Judicial Officer's conclusion that Berigan did acquiesce in the turns as determined by the dealers' flipping rule. We recognize that the evidence was conflicting but it was the Judicial Officer's power and duty to determine the weight that was to be given to the testimony and his conclusion that the "turn order" established by the dealers was accepted by Berigan is not unsupported by substantial testimony when considering the record as a whole and accordingly may not be disturbed. On the specific occasions referred to in the Order of Inquiry, the turns established by the dealers through the flipping process were automatically accepted by Berigan. The record justifies the further conclusion that as a general rule Berigan recognized and accepted the turns as established by the dealers. Any practice which results in dealers themselves determining in what sales alleys or in what order in a sales alley they shall bid is an unreasonable restriction on competition and the Judicial Officer must be upheld in his determination that the practice was a violation of § 312(a) of the Act (7 U.S.C.A., 1952 ed., § 213(a)).

In United States v. Swift & Co., D.C. Colo.1943, 52 F.Supp. 476, the defendant there challenged the sufficiency of an information wherein it was alleged that the turn system with respect to the purchase of lambs at the Denver stockyards violated Section 1 of the Sherman Antitrust Act (15 U.S.C.A., 1952 ed., § 1). The challenged information alleged that the four primary purchasers of lambs at the Denver stockyards determined among themselves the order or turns in which they would have the opportunity to look at and bid on lambs consigned for sale at Denver. The turns were rotated daily and the four turn holders were given prescribed periods of time within which they had the right to bid on the lambs being sold. In overruling the attack on the information, the court therein stated, at page 479:

"The natural result of this turn system is to directly restrain competition in the purchase of fat lambs on the Denver market. It might well be said that the action of these parties in ceasing country buying was to force the producer to ship his fat lambs to Denver and sell them subject to this turn system. Clearly it is a course of trade in the merchandising of fat lambs moving in interstate commerce that has the effect upon prices in the Denver market, and deprives the producers and consumers of the advantages of the free competition they are entitled to."

The court further stated, at page 479:

"The practice itself is open to the charge that the four buyers before making their bids can agree upon prices to be offered, and determine in advance which one of them shall make the highest bid and be enabled to fill his orders for fat lambs in a manner condemned by the Sherman Act and the decisions."

We think similar reasoning is applicable to the situation herein. Before flipping the dealers could get together and decide among themselves what prices they were going to pay that day for the various pens of cattle.

■ (c) The Judicial Officer found that Berigan gave favored treatment and priority to dealers in accordance with the order or turn which they had established without giving farmers or non-dealer buyers who had expressed a desire to bid on livestock an opportunity to bid until after the dealers had first chance. In

viewing the record as a whole, we conclude that these findings are not "unsupported by substantial evidence" and accordingly may not be set aside.

The conclusion is inescapable from the testimony brought out in the record that the *turn system was a combination* (dealers and Berigan) formed for the purpose of controlling the buying and selling of livestock at the Berigan commission house—or contributed to that result. It is sufficient to resolve, as the Judicial Officer did, that it was a *combination* which unreasonably restricted competition, in violation of the Act. The result is that the cease and desist order is applicable to all respondents, the several dealers as well as Berigan.

■ As to respondents' third claimed error, the Judicial Officer further found and concluded that during the period involved Berigan failed to furnish reasonable buying services in the purchase of livestock. The basis for that finding and conclusion was that Berigan routinely filled its orders at the stockyards for the purchase of cattle by making purchases from dealers—frequently on a "transfer of weight basis"; i. e., transferring the ownership of a consignment of cattle without reweighing the cattle—instead of attempting to purchase the cattle directly from other commission firms. The Judicial Officer found that in October, 1953, 98% of the cattle purchases by Berigan at the stockyards for customers were made from registered dealers; that during the period from September 1 through November 30, 1954, 84.9% of the purchases by Berigan were from registered dealers, the majority of whom are respondents herein, and that a major portion of the purchases from dealers was on a "transfer of weight" basis and that mark-up prices ranged from 15¢ per cwt. to $3.50 per cwt.; that during the period from August 1, 1955, through October 31, 1955, Berigan purchased 63.3% of the stocker and feeder cattle for its customers from registered dealers, and that a major portion of such purchases was from the respondents in this proceeding.

Berigan, by failing to purchase livestock in the stockyards on the open market, regularly incurred the added expense of the dealers' mark-up in price which the purchasers were required to pay. It is pointed out that in some instances it is best to purchase livestock from dealers because the dealers can mix various consignments together, but the record indicates that many of the purchases herein were on a "transfer of weight" basis and therefore the identical consignments sold to the dealers were resold to Berigan. It was the duty of the Judicial Officer, acting for the Secretary, to draw conclusions from the conflicting testimony and, as pointed out, his conclusions may not be set aside unless, viewing the record as a whole, they are "unsupported by substantial evidence", and we do not so find.

As to all issues, the respondents have raised the question of the sufficiency of the evidence. We have examined the great mass of testimony produced by both sides. A detailed review of such testimony here would serve no useful purpose and would unduly prolong this opinion. Our examination convinces us that the Judicial Officer's findings are based on substantial, even if conflicting, testimony. We may not, even if we were so inclined, which we are not, substitute our judgment for his in a field in which he is expert.

As to the fourth claimed error, all of the facts justified limiting the administrative sanction to a cease and desist order which is appropriate to prevent the recurrence of the unlawful practices. We conclude that the findings of the Judicial Officer are supported by substantial evidence, that his conclusions have a rational basis in law and that the petition to vacate the order should be denied.