Fred S. AIKINS et al., Petitioners,

v.

UNITED STATES and Ezra Taft Benson, Secretary of Agriculture, Respondents.

No. 6206.

United States Court of Appeals Tenth Circuit.

Aug. 11, 1960.

54

Joseph J. Kelly, Jr., Kansas City, Mo. (Howard F. Sachs and Spencer, Fane, Britt & Browne, Kansas City, Mo., of counsel, were with him on the brief), for petitioners.

Donald A. Campbell, U. S. Dept. of Agriculture, Washington, D. C. (George Cochran Doub, Asst. Atty. Gen., Samuel D. Slade, Atty., Dept. of Justice, and Neil Brooks, Asst. Gen. Counsel, Washington, D. C., were with him on the brief), for respondents.

Before BRATTON, PICKETT and LEWIS, Circuit Judges.

LEWIS, Circuit Judge.

Petitioners are thirty-eight registered dealers at the Kansas City Stockyards,

Kansas City, Missouri. They seek, by joint and several petition, review of a decision and order of the Secretary of Agriculture made under the Packers and Stockyards Act of 1921, 42 Stat. 159, as amended, 7 U.S.C.A. § 181 et seq. Jurisdiction and venue lie by virtue of 5 U.S. C.A. §§ 1032, 1033.

On June 22, 1959, after a full hearing in a disciplinary proceeding instituted by the Director, Livestock Division, Agricultural Marketing Service, United States Department of Agriculture, petitioners were ordered to cease and desist from any further participation in the so-called "turn" system, a practice found violative of § 312(a) of the Act (7 U.S. C.A § 213(a)) which provides:

"(a) It shall be unlawful for any stockyard owner, market agency, or dealer to engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in connection with the receiving, marketing, buying, or selling on a commission basis or otherwise, feeding, watering, holding, delivery, shipment, weighing, or handling, in commerce at a stockyard, of livestock."

The Kansas City Stockyard is a terminal yard where livestock is sold by private treaty rather than open and competitive auction. By this method of sale, one person at a time is permitted to inspect and bid upon the livestock. If the bid is accepted, the sale is consummated and the pen closed; if the bid is not accepted, another prospective purchaser is admitted and the procedure continues until a sale is made or the available number of buyers is exhausted. Most often, however, the transaction is completed with the buyer first allowed the privilege of inspection and bid and it is a recognized advantage to have the opening bid.

Dealers such as petitioners buy for their own account for resale. They are in initial competition with order buyers and farmers although the latter often become the ultimate customers of the dealers. It is recognized that dealers perform both a necessary and valuable service at the yard for frequently the needs of outside buyers are insufficient to meet the supply of livestock available for sale upon a given day.

In order to determine as between themselves who should be first admitted to the commission alleys and thereby be favored with the first opportunity to buy, the dealers have resorted for many years to the allocation of turn by chance, agreeing to abide by the flip of a coin or the drawing of lots. This agreement premises the charge of the order of inquiry that the dealers "knowingly participated in an arrangement or turn system" and that the market agencies recognized the turn system and gave preferred treatment and priority in connection with sales of consigned stocker and feeder cattle, which activity, it is charged, "made it unduly difficult for farmer-feeders, individually or through registered order buyers, to buy their replacement cattle 'out of first hands' and in open competition with all other buyers."

As originally instituted, the proceeding before the hearing officer contemplated a cease and desist order against the market agencies also but those named agencies promptly entered a stipulation with the government that they would discontinue giving recognition to the turn system. Evidence was introduced showing that the turn arrangement was not in accordance with the wishes and judgment of the market agencies and that they had attempted to rid themselves of it in prior years but that the pressure from their largest, most consistent buyers, the dealers, had caused them to continue to honor the dealers' priority determination by lot. After this stipulation was entered language of the charge against the dealers was changed from the allegation that they had "caused or attempted to cause" the agencies to accept their draw and give them priority over other buyer groups to allege that "the commission firms [market agencies] recognized such turns, relied on and acquiesced in it" and gave the respondents priority over other buyers.

Although it would appear that the turn system would be utterly ineffective with-

out the cooperation of the sellers, the hearing examiner held an extensive hearing on the culpability of the dealers and issued the cease and desist order against them because he evidently felt that the persistence of the dealers in their system would continue to effect the situation sought to be curtailed. He recognized the fact that changes had taken place in the market since the stipulation but stated:

"* * * since January 1958 * * * off-market buyers in some instances have been taken ahead of dealers in trading on stocker and feeder cattle. In fact, respondents contend that since the stipulation was entered into they are systematically discriminated against by the commission firms. It should be noted however, that this change in marketing conditions at the Kansas City Stockyards occurred several months after the period of violations alleged in the complaint and only after the said stipulation was entered into. It is believed that the new treatment being accorded off-market buyers is ephemeral in nature. It is altogether probable that this improved condition will continue only if the dealers are ordered by the Secretary to discontinue engaging in and using the turn system. The traders have flatly refused to cooperate with complainant in its efforts to eliminate the turn system and they have repeatedly resisted attempts in the past by commission firms to rid themselves from the operation of the turn system at the market. The commission firms have done their part by entering into the aforesaid stipulation in attempting to eliminate the turn system. However, unless respondents are ordered to cease and desist from engaging in and using the turn system practice, the same pressures and the same fears of retaliatory action by the dealers which caused the commission firms to acquiesce in the turn system practice prior to January 1958, may make it impossible for the commission firms to comply fully with the terms of and agreements in said stipulation. * * * *"

The judicial officer reviewed the facts pertaining to the participation of each petitioner in the drawings at the head of the commission alleys prior to bidding and ordered the activities ceased in all instances, whether other buyers than dealers were seeking admission to the alleys or not. The judicial officer cited and relied on the language of the only case precisely in point, Berigan v. United States, 8 Cir., 257 F.2d 852:

"* * * Any practice which results in dealers themselves determining in what sales alleys or in what order in a sales alley they shall bid is an unreasonable restriction on competition and the Judicial Officer must be upheld in his determination that the practice was a violation of § 312(a) of the Act * * *." 257 F.2d at page 859.

Petitioners urge that this holding was erroneous unless read in the context of evidence showing actual discrimination, collusion, or other unfair practices tending toward control of stockyard sales. They argue that the stipulation entered by the market agencies renders the possibility of future favoritism based on the drawings merely speculative and not the proper subject of a cease and desist order, that there can be no prejudicial discrimination where only consenting dealers are present for the purpose of buying, that the market agencies' salesmen are legitimately endowed with the power to select the most promising buyer and might well prefer to deal with an established dealer, that the evidence shows that in some instances country buyers were given preference over dealers, and that the system of drawing lots actually is of benefit to the peaceful functioning of the stockyard as a public utility. The government contends conversely that the mere drawing or flipping for turns with the motivation of influencing the market agencies in their selection of first bidders is violative of the Act and that addi-

tionally the evidence demonstrates that the result in this particular case was a restraint upon free trading at the Kansas City Stockyard and hence an unjustly discriminatory practice prohibited by the statute.

We must here note the rather persuasive argument of petitioners that the continuation of the turn system is desirable from the standpoint of the orderly and efficient operation of the stockyard. Pointing out that in the years before the dealers agreed to abide turn by the flip of a coin priority of entrance to the commission alleys was determined by "footraces and fisticuffs," they urge that their self-imposed discipline has removed disharmony. And petitioners further assert that the dealers are the natural and favored buyers because of their large and continued purchases upon established credit. But we note these contentions only to reject them as not within the scope of proper judicial review. The responsibility for the efficient regulatory operation of matters falling within the purview of the Packers and Stockyards Act lies solely with the Secretary of Agriculture. Appellate review of the Secretary's decisions is limited to the correction of errors of law, Producers Livestock Marketing Ass'n v. United States, 10 Cir., 241 F.2d 192, affirmed Denver Union Stock Yard Co. v. Producers Livestock Marketing Ass'n, 356 U.S. 282, 78 S.Ct. 738, 2 L.Ed.2d 771, and to a consideration of the sufficiency of the evidence forming the foundation for factual findings. The weight of the evidence and the inferences to be drawn therefrom are left to the judgment of the administrative body expert in the particular field, Hyatt v. United States, 10 Cir., 276 F.2d 308.

With these rules in mind a review of the voluminous record in this case shows ample support for the findings of the Judicial Officer and the premise for the issuance of a cease and desist order prohibiting the turn system both in instances where potential buyers other than dealers are present and where they are not. The dealers' practice undoubt-edly tended to discrimination unfairly in those instances when order buyers and farmer-feeders sought to buy first-hand at the alleys. One witness, a farmer, made a written record of various attempts to buy at the stockyard and testified that he was told by specified salesmen that

> "he would have to show them to the man who won the turn but that if he didn't sell them to the dealers on the turns he would sell them to me."

> "he couldn't show me the calves first that morning because he had 14 other loads to sell and if he showed me this short load of 21 head he might be in trouble with the dealers, that he had to take them first in the alleys."

> "the dealer who won the draw would have to be shown the cattle first."

> "the dealers wouldn't buy any of the other cattle that he had for sale if he didn't give the man who won the draw first turn."

> "that the only way he could let me see them first was to get the traders to let me draw with them."

The witness was sufficiently interested in a particular pen of calves that although he had been refused admittance to the alley by the salesman he sought to draw with the four dealers waiting at the head of the alley. He was refused with the statement "This is for dealers only, we are here every day * * * if we don't buy them, why, then you have a turn at them." Of course, these statements and others similar in import are competent as being beyond the scope of the hearsay rule as being asserted not to evidence the truth of their context but to relevantly show the refusal to deal with an off-market buyer, VI Wigmore, Evidence, § 1766–67.

Petitioners contend, however, that there are a number of reasons why the market agencies might prefer to deal with them and not merely because they feared unfair reprisals from dealers if they failed to honor the turn system. Al-

though this may be true absent the strange compulsion of the drawing, the resolution of the Board of Directors of the Kansas City Live Stock Exchange (the organization of market agencies) passed June 24, 1954 [1] is indicative of the power of the drawing and the agencies' attempt to escape it.

■■ It is of course clear that the turn system cannot unfairly discriminate against outside buyers in those instances in which only dealers are present and no others seek an opportunity to buy. And, since the sellers are not bound to recognize the turn system and, in fact, have pledged themselves not to, petitioners contend that their arrangement cannot be violative of the Act. Such a contention has only initial appeal. The arrangement is intended to have significance, Berigan v. United States, supra, and has the practical effect of limiting the number of prospective purchasers. Those dealers not successful in the flip make no attempt to purchase. But more important, the cease and desist order is properly based upon the foreseeable difficulties of supervising a fair market recognizing only in part the turn system, and the inherent possibilities of unfair practices such as price-fixing among the dealers, United States v. Swift & Co., D.C.Colo., 52 F.Supp. 476. The lack of proof that dealer-buyers are disgruntled with a system of their own device, which apparently works to their advantage, cannot be held to restrict the administrative agency in its efforts to give effect to the declared policy of Congress to keep the stockyards open to free competition, cf. Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271, 133 A.L.R. 1217:

"* * * But in the nature of things Congress could not catalogue all the devices and stratagems for circumventing the policies of the Act. Nor could it define the whole gamut of remedies to effectuate these policies in an infinite variety of specific situations. Congress met these difficulties by leaving the adaptation of means to end to the empiric process of administration. The exercise of the process was committed to the Board, subject to limited judicial review. Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy. On the other hand, the power with

---

1. "The following resolution was offered and unanimously adopted by the Board of Directors of the Kansas City Live Stock Exchange at it's (sic) meeting held Wednesday, June 24, 1954.

"Whereas: the drawing for turns by dealers and speculators in the cattle sales alleys of Market Agency members of this Exchange has caused widespread criticism. Dissatisfaction with the practice has been voiced by many segments of the industry and

"Whereas: the market has lost and is continuing to lose the support of untold numbers of buyers by reason of this practice and

"Whereas: the Chief of the P. & S. Administration in Washington, D. C. has repeatedly expressed his displeasure with the method used and its discriminatory application and

"Whereas: the Market Agency salesmen are clothed with full authority to make their own selection from among all potential buyers who make desire to trade on cattle they have to offer and take them in such order as they dictate. Therefore, Be It

"Resolved: that we consider the present practice of drawing for turns as conducted by dealers and speculators located here to be inimical to the welfare if (sic) the market and the best interests of it's (sic) many patrons and be it further

"Resolved: to the end of eliminating this practice, that all members of this Exchange be urged to refuse to comply, effective as of July 6, 1954, with the terms of the present drawing method and from then on to allocate turns among buyers on their own election, and Be it Further

"Resolved: that copies of this resolution be given widespread circulation among organizations of live stock men."

which Congress invested the Board implies responsibility—the responsibility of exercising its judgment in employing the statutory powers."

Agencies have the discretionary power to issue declaratory orders to terminate a controversy or remove uncertainty, 5 U.S.C.A. § 1004(d) and there is a reasonable relationship, as shown by the evidence of this case, between the order preventing the dealers from engaging in practices designed to give them control of the bidding by reason of their organization and the policy of the Packers and Stockyards Act.

■ We find the order of the Judicial Officer, acting for the Secretary of Agriculture, to be proper in law and supported in fact. Accordingly, the several and joint petitions to vacate are denied.