## SIOUX CITY STOCK YARDS CO. v. UNITED STATES.

### Civ. No. 121.

District Court, N. D. Iowa, W. D.

April 23, 1943.

Henry C. Shull and Robert M. Harben, both of Sioux City, Iowa, for plaintiff.

James A. Doyle, of Lincoln, Neb., and Tobias E. Diamond, William B. Danforth, and Franklin E. Gill, all of Sioux City, Iowa, for defendants.

Before JOHNSEN, Circuit Judge, DONOHOE and DELEHANT, District Judges.

JOHNSEN, Circuit Judge.

The Sioux City Stock Yards Company seeks to enjoin the enforcement of, and to set aside, a cease and desist order, made by the Secretary of Agriculture under the provisions of the Packers and Stockyards Act, 1921, as amended, 42 Stat. 163–168, 44 Stat. 397, 7 U.S.C.A. §§ 201–203, 205–217, forbidding it to deprive Carpenter-Walsh Commission Company, as the operator of an established livestock commission business at the stockyard in Sioux City, Iowa, of the continued use of its stockyard facilities.

The applications for an interlocutory injunction and for a permanent injunction on the merits were consolidated for hearing, by stipulation and agreement of the parties, and the matter has been heard by a three-judge court, called pursuant to 42 Stat. 168, 7 U.S.C.A. § 217, and 36 Stat. 1149, 38 Stat. 220, 219, 28 U.S.C.A. §§ 46, 47, 48.

The facts are undisputed. The Sioux City stockyard, owned and operated by plaintiff, has been duly posted by the Secretary of Agriculture, under 42 Stat. 163, 7 U.S.C.A. § 202, as being subject to the provisions of the Packers and Stockyards Act. See 9 Code of Fed.Reg. § 204.1. Carpenter-Walsh Commission Company was duly registered as a market agency at such stockyard, as required by 42 Stat. 163, 7 U.S.C.A. § 203. For a number of years preceding the event here involved, plaintiff had recognized the Commission Company's right to operate at the stockyard, by leasing office space to it in the Exchange Building maintained for that purpose and by assigning yard pens to it, in accordance with the rules and practice applicable to all 29 of such market agencies operating at the market.

On January 5, 1942, plaintiff sent the Commission Company a letter, stating that, after an analysis of the volume of business handled by the Commission Company and the pen facilities which had been used in connection with it, plaintiff had concluded that the operations of the Commission Company were not essential to the proper conduct of the Sioux City market, and that its office lease, which expired December 31, 1941, would therefore not be renewed, and that, effective February 1, 1942, its pen assignments would be discontinued. Similar notices were sent to two other commission companies.

The Commission Company filed an informal complaint against plaintiff with the Secretary of Agriculture, under 42 Stat. 165, 7 U.S.C.A. § 210, and, after notice and filing of answer, the matter was submitted to a trial examiner designated by the Secretary, on a written stipulation of facts and upon the briefs of the parties. The examiner made a report and recommendations favorable to the Commission Company, to which plaintiff filed its exceptions. The matter was then heard on oral argument by an Assistant to the Secretary of Agriculture, pursuant to 9 Code of Fed.Reg. § 202.1. Thereafter, on December 17, 1942, the Assistant entered the cease and desist order against plaintiff, which is here attacked, with supportive findings.

The Secretary's findings are based upon the written stipulation of facts. They

show that, during 1941, Carpenter-Walsh Commission Company had handled only 0.9 per cent of the livestock receipts at the Sioux City stockyard and had made a daily average use of its assigned pen space of only 7.8 per cent. The only commission companies at the stockyard which had a lower percentage were the two which also were given discontinuance notices. Of the remaining commission companies, the next highest had a percentage of 1.4 of the total livestock receipts on the market. There were five companies which each did a business of between 1 and 2 per cent; six did a business of between 2 and 3 per cent; and the business of the others ranged between 3 and 10.1 per cent. On a cattle basis (3 hogs or 5 sheep being treated as equal to 1 head of cattle), the average daily receipts at the Sioux City market were 5,315 head, while those of Carpenter-Walsh Commission Company were 50 head, with a range from 539 to 31 head. The daily average use of assigned pen space by the commission companies at the stockyards, other than the three which were given discontinuance notices, ranged from 44.8 per cent to 3.5 per cent, with a general average of 23.5 per cent.

The findings of the Secretary point out, however, that there is nothing in the stipulation, or in the record otherwise, to indicate that there were too many commission companies using plaintiff's stockyard facilities for the efficient handling of the livestock on the market; or that any other commission company had been handicapped in its operations by the granting of yard pens and office space to Carpenter-Walsh Commission Company; or that the operations of the Carpenter-Walsh Commission Company had resulted in any financial loss or burden to plaintiff or constituted an economic waste on the market to the buying and shipping public; or that the Commission Company could not have been assigned less pen space, commensurate with its business, and thus have shown a considerably higher percentage of space use,—it appearing from the stipulation that ten other commission companies had been assigned smaller pen space than that allocated to Carpenter-Walsh Commission Company.

The Secretary further observed in his findings that "the evidence as to the use of pen space and volume of business done is restricted to the year 1941", and that "it seems inadequate, at least on the evidence in this proceeding, to deprive the complainant of the right to do business on the basis of a one-year test period, especially when a smaller allocation of pen space would have shown a higher percentage of utilization and when the allocation of pen space, if made in accordance with the volume of business done by the commission firms in previous years, would indicate that 1941 is not necessarily a representative year for the complainant's business."

The Secretary also pertinently called attention to the fact that there was no contention that Carpenter-Walsh Commission Company had been guilty of any misconduct or any violation of the Packers and Stockyards Act; that it appeared that the Commission Company had been operating regularly as an established market agency at the stockyard for a number of years preceding; that the evidence showed no rule or regulation of the stockyard "which put the complainant on notice that its continuation in business depended upon the degree of utilization of assigned pen space or the volume of business done"; that the Commission Company had never been given any notice that the volume of its business was unsatisfactory, prior to the receipt of the summary notice of January 5, 1942, advising it that its right to do business at the stockyard was being summarily terminated as of February 1, 1942; and that such a summary attempt to exclude the Commission Company from the market and to terminate its established business "violates fundamental standards of fairness."

As to the contention of the Stock Yards Company that the Commission Company was not essential to the market and that its elimination would be conducive to efficiency, the Secretary declared: "But, in view of the evidence, the gist of these claims seems to be simply that, all the complainant's business could be transacted more efficiently if absorbed by the other larger firms. This may be true, but it hardly establishes the reasonableness of the respondent's action and, if permitted to serve as the sole criterion for liquidating commission firms, could easily bring about a monopoly of one or two firms by successive eliminations of the firms doing the least business."

In support of its right to an injunction, plaintiff contends here that there is involved only a purely private relationship between itself and the Commission Company, in which no injury is threatened or is being visited upon the buying or shipping public; that the question therefore is sim-

ply one of inherent managerial power and function in respect to its ownership of the stockyard property, and of legitimate discretion in controlling the physical facilities of the business in which it is engaged; that the regulatory powers of the Secretary of Agriculture under the Packers and Stockyards Act do not extend to such incidents, and his authority cannot be exercised to curtail plaintiff's right to lease its facilities to whom and upon such conditions as it desires, so long as no market injury is threatened or visited upon the buying or shipping public; that, before the Secretary of Agriculture has the right to interfere in such a situation or relationship, it must appear that market injury to the buying or shipping public exists or is threatened, and the Secretary must make such a foundational finding, based upon substantial evidence in the proceedings before him; and that, if the Packers and Stockyards Act be not so construed, then it is unconstitutional as depriving plaintiff of its freedom of contract and of its property without due process of law, in violation of the Fifth Amendment.

■ A reading of the provisions of the Packers and Stockyards Act, 7 U.S.C.A. § 181 et seq., its legislative history, and the interpretative decisions under it, indicates clearly that Congress has conferred upon the Secretary of Agriculture plenary power to supervise and regulate the business of a public stockyard and its market agencies, including all the material incidents and relationships of its marketing processes. See H.R.ReportNo.77, 67th Cong., 1st session; Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229; United States v. American Livestock Commission Co., 279 U.S. 435, 49 S.Ct. 425, 73 L.Ed. 787; Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524; United States v. Donahue Bros., Inc., 8 Cir., 59 F.2d 1019; Farmers' Livestock Commission Co. v. United States, D.C.E.D.Ill., 54 F.2d 375; Carnes v. St. Paul Union Stock-Yards Co., 164 Minn. 457, 205 N.W. 630, 631, 206 N.W. 396; Nashville Union Stockyards, Inc., v. Grissim, 153 Tenn. 225, 280 S.W. 1015. The Supreme Court has referred to the powers of the Secretary under the Act as "extraordinary powers". Morgan v. United States, 304 U.S. 1, 15, 58 S.Ct. 773, 82 L.Ed. 1129.

The material incidents and relationships of the marketing process at a public stockyard would include, among other things, the interrelationships between the stockyard owner or operator and the market agencies operating on it, which touch in any manner the conduct of the market. The statute expressly declares that the Secretary of Agriculture shall have authority, after full hearing, to prohibit "any rate, charge, regulation, or practice of a stockyard owner or market agency, for or in connection with the furnishing of stockyard services", which, in his opinion, "is or will be unjust, unreasonable, or discriminatory", and, if he chooses to do so, to "determine and prescribe what will be the just and reasonable * * * rates or charges, to be thereafter in such case observed * * * and what regulation or practice is or will be just, reasonable, and nondiscriminatory to be thereafter followed". 42 Stat. 166, 7 U.S.C.A. § 211.

Section 301 of the Act, 42 Stat. 163, 7 U.S.C.A. § 201, defines "stockyard services" as "services or facilities furnished at a stockyard in connection with the receiving, buying or selling on a commission basis or otherwise, marketing, feeding, watering, holding, delivery, shipment, weighing, or handling in commerce, of livestock". Section 304, 42 Stat. 164, 7 U.S.C.A. § 205, provides that "It shall be the duty of every stockyard owner and market agency to furnish upon reasonable request, without discrimination, reasonable stockyard services at such stockyard * * *."

■ We entertain no doubt that the leasing of reasonable office space in an exchange building maintained by the stockyard company for that purpose and the allocation of suitable, available pen space in the yards, to the market agencies entitled to operate at the stockyard, are within the definition and prescription of sections 301 and 304, quoted above, as representing "facilities furnished at a stockyard in connection with the receiving, buying or selling on a commission basis * * * of livestock", and are therefore clearly within the supervisory authority of the Secretary of Agriculture, with a right on his part to determine whether the action of the stockyard company with respect to them has been unjust, unreasonable or discriminatory. The denial of office space and yard pens to an established market agency entitled to operate at the stockyard can not, therefore, as plaintiff contends, be held to involve simply a private relationship between such parties or to concern merely

the stockyard owner's right of freedom to contract.

But the question here is, of course, deeper than the mere denial, as such, of reasonable office space and yard pens to an operating market agency; for plaintiff's admitted purpose and the effect of its action were to exclude Carpenter-Walsh Commission Company entirely from further operation as an established market agency.. The effect of plaintiff's contention is that, in its right to manage its own stockyard business, it had the right thus to wipe out the Commission Company's established business and to deprive the public of the latter's services, so long as the remaining agency facilities on the market were adequate to serve the needs of the public. But other rights were involved than the mere management of plaintiff's own business. The Carpenter-Walsh Commission Company had been admitted to operation on the market and had come to have an established status thereon. The public was doing business with it. The Secretary of Agriculture, in his right to supervise and regulate all the activities of a general livestock market and all the necessary or established relationships involved in its functioning, could properly prohibit plaintiff from disturbing the established status of the existing market and the choice of dealing which the public had theretofore been granted therein, without some sound, sufficient reason for the change, that would not be unjust, unreasonable or discriminatory as against any one in the market who was within the operation and protection of the Act. Any attempt to exclude a previously operating market agency from an established market would therefore be an action which the Secretary of Agriculture was entitled to examine and to determine the justness, reasonableness or discriminatoriness of, from the standpoint of the whole market situation and all the relationships involved in it.

The findings of the Secretary specifically call attention to the fact that Carpenter-Walsh Commission Company was an established market agency at the stockyard and had been so for a number of years preceding; that it was serving customers among the buying and shipping public; that the Stock Yards Company had had no regulation that required a market agency to do a certain volume of business in order to entitle it to continue to operate at the stockyard; that Carpenter-Walsh Commission Company had never previously been given any notice that its volume of business was unsatisfactory; that there was no showing that its business had constituted a financial burden to the Stock Yards Company or an economic waste in the industry and market; that, so far as the record is concerned, there is nothing to indicate that Carpenter-Walsh Commission Company could not have been assigned a smaller pen space commensurate with its business, such as appeared to have been done with some of the other commission companies; and that the actual difference between the percentage of business of the Carpenter-Walsh Commission Company, in relation to the total volume of business done at the stockyard, and the percentage of some of the other commission companies, who were not attempted to be ousted from the market, was only a fraction of one per cent.

On all the circumstances and considerations stated, we are of the opinion that the Secretary of Agriculture was justified in concluding that, on the basis and in the manner in which it was undertaken, plaintiff's summary decision to exclude the Commission Company from the market, with the effect of forfeiting its established business, and of depriving the buying and shipping public of the choice of its further services, was an unjust, unreasonable and discriminatory practice in the market, within the meaning and purpose of the Packers and Stockyards Act, and was one against which he was authorized, upon full hearing, to issue an appropriate cease and desist order. As the Secretary pertinently adds in his findings, the reason given by the Stock Yards Company for its action, that the volume of the Commission Company's business was such as to make it nonessential to the market, "if permitted to serve as the sole criterion for liquidating commission firms, could easily bring about a monopoly of one or two firms by successive eliminations of the firms doing the least business."

Plaintiff further argues that it is entitled to have the order of the Secretary set aside, as resting upon an erroneous rule of law, within the standards of Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 442, 50 S.Ct. 220, 74 L.Ed. 524. The argument is predicated upon the following expression of the Secretary in his findings and conclusions: "The language * * * of the Act is extremely broad and general in scope, and there is no inti-

mation that these provisions do not extend to dealings between a stockyard owner or operator and the marketing agencies doing business on the stockyards, or that they extend to such dealings only when injury is threatened or visited upon the livestock buying and shipping public." Plaintiff's brief says: "What the Secretary was deciding in the above quoted language was that he had jurisdiction to try any controversy between the yards owner and the commission men even though the controversy in no way affected the public intended to be protected by the Act. This, we contend, is wholly an erroneous view of the law."

The language used by the Secretary must be read in the light of his complete findings and conclusions. When so read, it is clear that the Secretary was not assuming to hold that he had jurisdiction over every controversy between a stockyard owner or operator and a market agency, regardless of whether it bore any sound relationship to the market. The statement was merely made, we think, in answer to plaintiff's contention that no actual injury was being threatened or visited upon the public by its actions, so long as the remaining market agencies were sufficient to serve the public needs, and that the Secretary therefore had no authority to interfere. We have heretofore pointed out that the Secretary of Agriculture has the power under the Packers and Stockyards Act to supervise and regulate all the activities of the livestock market at a public stockyard and all the necessary or established relationships involved in its functioning. The careful analysis made by the Secretary of the facts and relationships involved in the present situation and the conclusions stated by him clearly show that it was this principle which he applied to his decision and not any concept of an arbitrary right to intrude himself into some purely personal controversy between a stockyard owner and a marketing agency, which in no way touched upon the freedom, fairness, integrity, or stability of the market.

■ The contention that the Secretary had no jurisdiction to enter the order here involved, without a specific foundational finding that a market injury was being threatened or would be visited upon the buying or shipping public and that a public interest was therefore involved, is without merit, because the statute, neither expressly nor impliedly, makes any such formal finding a jurisdictional prerequisite to the Secretary's power to act. The Secretary is given plenary power, upon full hearing, to examine all the activities of a public stockyard market and all the necessary or established relationships involved in its functioning, and to prohibit by appropriate cease and desist order any unjust, unreasonable or discriminatory practice in connection therewith. 42 Stat. 166, 7 U.S.C.A. § 211. The Secretary specifically found that plaintiff's action in attempting to eliminate Carpenter-Walsh Commission Company from doing business on the market was a matter that was subject to the provisions of sections 304 and 307 of the Act, 7 U.S.C.A. §§ 205, 208, and was subject to the exercise of the appropriate powers of supervision and control given the Secretary in sections 308, 309 and 310 of the Act, 7 U.S.C.A. §§ 209, 210, 211, and that, on the facts presented, the action of plaintiff was unjust, unreasonable and discriminatory, within the prohibition of sections 304 and 307 of the Act, 7 U.S.C.A. §§ 205, 208. This and the other specific findings made on the evidence fully satisfied all the requirements of "quasi jurisdictional", "basic or essential" and ordinary findings, within the rules of Morgan v. United States, 298 U.S. 468, 480, 56 S.Ct. 906, 80 L.Ed. 1288; United States v. Carolina Freight Carriers Corporation, 315 U.S. 475, 489, 62 S.Ct. 722, 86 L.Ed. 971; Lubetich v. United States, 315 U.S. 57, 59–60, 62 S.Ct. 449, 86 L.Ed. 677.

■ There is also clearly no merit in plaintiff's contention that the Secretary's order is violative of the Fifth Amendment. The expression of the Supreme Court in Denver Union Stock Yard Co. v. United States, 304 U.S. 470, 482, 58 S.Ct. 990, 997, 82 L.Ed. 1469, is apposite here: "There is no ground for the appellant's suggestion to the effect that the order unlawfully invades its right as owner to manage the yard and control its business policy." The Secretary's order clearly bore such a reasonable relation to the proper regulation of the stockyard market that it could not possibly be said to deprive plaintiff of its property without due process of law.

Appropriate findings and conclusions are being filed, and an order will be entered denying plaintiff's right to an injunction and dismissing the complaint.