Clifford McCLENEGHAN, Appellant,

v.

UNION STOCK YARDS CO. OF OMA-HA, a corporation, Omaha Live Stock Exchange, an unincorporated association, Omaha Livestock Traders Exchange, an unincorporated association, Appellees.

No. 16613.

United States Court of Appeals
Eighth Circuit.

Jan. 23, 1962.

Rehearings Denied Feb. 21, 1962.

Martin A. Cannon, Omaha, Neb., for appellant.

G. L. DeLacy, Omaha, Neb., for appellee, Union Stock Yards Co. of Omaha, and Kennedy, Holland, DeLacy & Svoboda, Omaha, Neb., on the brief.

Alexander McKie, Jr., Omaha, Neb., for appellee, Omaha Live Stock Exchange, and Barton H. Kuhns, Omaha, Neb., on the brief.

Howard F. Sachs, Kansas City, Mo., for appellee, Omaha Livestock Traders Exchange, and Edward G. Garvey and Joseph J. Kelly, Jr., Kansas City, Mo., Crawford, Garvey, Comstock & Nye, Omaha, Neb., and Spencer, Fane Britt

& Browne, Kansas City, Mo., on the brief.

Before VOGEL and BLACKMUN, Circuit Judges, and BECK, District Judge.

BLACKMUN, Circuit Judge.

This is a private antitrust action for treble damages. It presumably is based on §§ 1 and 2 of the Sherman Act and § 4 of the Clayton Act, 15 U.S.C.A. §§ 1, 2 and 15, respectively. The district court dismissed the action on the ground that it did not have primary jurisdiction over the subject matter. The appeal is from that dismissal.

The complaint alleges:

Plaintiff is an individual. Defendant Union Stock Yards Co. of Omaha ("Stockyards") is a corporation operating the Omaha stockyards and furnishing stockyard services and facilities in interstate commerce there. Defendant Omaha Live Stock Exchange ("Livestock") and defendant Omaha Livestock Traders Exchange ("Traders") are unincorporated associations of market agencies and dealers engaged in the buying and selling of livestock in interstate commerce at the Omaha stockyards.[1] Livestock and Traders, by rules and agreements, control and regulate the business activities of their respective members.

Plaintiff has been engaged for over 35 years as a livestock dealer at the Omaha yards buying and selling various types of livestock on his own account and for others. This has been his sole means of livelihood. On and after October 22, 1951, the defendants entered into and continued a combination and conspiracy to secure a monopoly and to restrain interstate commerce in the purchase and sale of high quality stocker and feeder cattle at the Omaha yards. Specifically, the combination and conspiracy worked as follows: Traders by a rule agreed to a scheme under which its members, by

---

1. The terms "stockyard services", "market agency", and "dealer", appearing in the complaint, are obviously employed in the sense in which these terms are respec-tively defined in § 301, as amended, of the Packers and Stockyards Act, 1921, 7 U.S.C.A. § 201.

flipping coins, determined priority among themselves for the opportunity to bid on stocker and feeder cattle offered for sale at any particular agency alley. By this means they selected three of their number as the first three bidders. The rule allowed only members of Traders to engage in the flip. Livestock and its members knew of and cooperated with this rule of Traders and respected the flip in the selection of bidders to the exclusion of all non-participants. The three winning flippers, all members of Traders, thus obtained priority of bidding opportunity over all other interested buyers. Stockyards knew of the existence and enforcement of this scheme and that it was discriminatory against persons such as the plaintiff, acquiesced in it, failed to establish and enforce nondiscriminatory practices in the furnishing of its stockyards services, and cooperated with the other defendants by discrimination in the furnishing of its services against non-complying members and non-members of Livestock and Traders. The scheme was operated by the defendants from October 22, 1951, until August 1958 when the practice was enjoined by this court.[2] The order of the Secretary of Agriculture which this court then affirmed was one issued June 18, 1957. Three days later Stockyards, because of the plaintiff's activity in the proceedings culminating in the issuance of that order, canceled plaintiff's pen assignment at the Omaha yards. This cancellation, still in effect, was discriminatory and in furtherance of the conspiracy.

Plaintiff thus was effectively barred from the purchase in the open market of first class cattle for his own account and for others. He has been damaged by way of lost income and increased costs occasioned by the shut out and by way of increased costs occasioned by the pen cancellation. And

2. The parties are in accord that this reference relates to the case of Berigan v. United States, 8 Cir., 1958, 257 F.2d 852. There this court refused to vacate a cease and desist order by the Secretary of Agriculture directed against a commission company and certain dealers operat-

"All of plaintiff's aforedescribed damages were directly and proximately caused by the conspiracy, combination and agreement of the defendants to restrain trade in and to create a monopoly in a part of the commerce among the several states, contrary to the laws of the United States."

Two separate and distinct discriminatory acts are thus alleged. The first, involving all defendants, is the purchasing shut out through the flip system from October 22, 1951, to August 1958. The second, claimed to be part of the execution of the conspiracy but primarily involving only Stockyards, is the pen cancellation since June 21, 1957.

Each defendant filed a motion to dismiss the complaint for failure to state a claim upon which relief could be granted and for lack of primary jurisdiction in the district court over the subject matter. As noted above, the court based its dismissal upon the latter ground. It also concluded that no purpose would be served by holding the action in abeyance pending any proceedings before the Secretary of Agriculture and any subsequent judicial review thereof.

In its brief here, Stockyards concedes that it operates a public livestock market at Omaha, that it is engaged in interstate commerce, and that its activities are governed by those provisions of the Packers and Stockyards Act, 1921, as amended, relating to stockyards.

For the purpose of the motions to dismiss we are to regard as admitted the well pleaded facts of the complaint. Cohen v. United States, 8 Cir., 1942, 129 F.2d 733, 735–6; Creswell-Keith, Inc. v. Willingham, 8 Cir., 1959, 264 F.2d 76, 81; Mr. Justice Clark, concurring, in Denver Union Stock Yard Co. v. Producers Livestock Ass'n, 1958, 356 U.S. 282, 290, 78 S.Ct. 738, 2 L.Ed.2d 771. This admis-

ing at the Omaha yards and indulging in the flip. None of the present defendants was a party to the Berigan litigation but the complaint here asserts that the present plaintiff caused those "proceedings to be commenced."

sion "does not, of course, embrace sweeping legal conclusions cast in the form of factual allegations". Pauling v. McElroy, D.C.Cir., 1960, 107 U.S.App.D.C. 372, 278 F.2d 252, 254, cert. den. 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60. Furthermore, a general allegation of conspiracy, without a statement of the facts constituting that conspiracy, is only an allegation of a legal conclusion and is insufficient to constitute a cause of action. Black & Yates v. Mahogany Ass'n, 3 Cir., 1941, 129 F.2d 227, 231, cert. den. 317 U.S. 672, 63 S.Ct. 76, 87 L.Ed. 539; Nelson Radio & Supply Co. v. Motorola, 5 Cir., 1952, 200 F.2d 911, 912–914, cert. den. 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356.

■ Without attempting here to particularize the complaint's "well pleaded" facts and to segregate them from its general legal conclusions, it is apparent, we think, that the gravamen of its charge is the flip system and the pen cancellation. Stripping the complaint down to these two items, we are satisfied that on its face it then contains allegations sufficient to constitute an antitrust cause of action. Compare United States Navigation Co. v. Cunard S. S. Co., 1932, 284 U.S. 474, 480, 52 S.Ct. 247, 76 L.Ed. 408.

The defendants argue, however, with no more than minor differences in their respective approaches, that the dismissal of the complaint was proper because the Secretary of Agriculture, and not the court, possessed "primary jurisdiction" over its subject matter or, in other words, that, under the Packers and Stockyards Act, the bases of the complaint are cognizable only before the Secretary. The plaintiff disagrees with this approach and urges that the doctrine of primary jurisdiction is not applicable to these defendants; that, also, it is applicable only in situations, different from this case, where the technical knowledge of the administrative agency is involved; that the Act does not oust the federal courts of jurisdiction of suits under the antitrust laws so long as matters of uniformity and specialized administrative knowledge are not involved; and

that, in any event, suspension "while the administrative gamut is run", and not dismissal, is indicated.

We therefore look first at the statute and then at the doctrine of primary jurisdiction.

■■ 1. *The Statute*. Under those provisions of the Packers and Stockyards Act, 1921, as amended, relating to stockyards and stockyard dealers, namely, §§ 301–317, 7 U.S.C.A. §§ 201–203 and 205–217a, the Secretary of Agriculture is given the general duty to regulate stockyards, market agencies and dealers, as therein defined. Sioux City Stock Yards Co. v. United States, N.D.Ia., 1943, 49 F.Supp. 801, 804, and cases cited; Schmidt v. Old Union Stockyards Company, 1961, Wash., 364 P.2d 23, 28. Stockyards and market agencies are made public utilities by the Act. Denver Union Stock Yard Co. v. Livestock Ass'n, 1958, 356 U.S. 282, 286, 78 S.Ct. 738, 2 L.Ed.2d 771; Swift & Co. v. United States, 1942, 316 U.S. 216, 232, 62 S.Ct. 948, 86 L.Ed. 1391; Stafford v. Wallace, 1922, 258 U.S. 495, 516, 42 S.Ct. 397, 66 L.Ed. 735. Specifically, § 304, 7 U.S.C. A. § 205, declares, "It shall be the duty of every stockyard owner and market agency to furnish upon reasonable request, without discrimination, reasonable stockyard services at such stockyard * * *". "Stockyard services" is defined by § 301(b), 7 U.S.C.A. § 201(b), to mean "services or facilities furnished at a stockyard in connection with the receiving, buying, or selling on a commission basis or otherwise, marketing, * * * weighing, or handling in commerce, of livestock". Rates and charges are to be reasonable and nondiscriminatory and any which is unreasonable or discriminatory is "prohibited and declared to be unlawful". § 305, 7 U.S. C.A. § 206. The next succeeding section provides for the scheduling of rates and the enforcement thereof. Then § 307, 7 U.S.C.A. § 208, provides:

"It shall be the duty of every stockyard owner and market agency to establish, observe, and enforce just, reasonable, and nondiscrimina-

**664**

tory regulations and practices in respect to the furnishing of stockyard services, and every unjust, unreasonable, or discriminatory regulation or practice is prohibited and declared to be unlawful".

§ 309, 7 U.S.C.A. § 210, authorizes a person complaining of a violation by a stockyard owner, market agency or dealer, of the provisions of § 307 or of other stated sections, or of an order of the Secretary, to apply to the Secretary by petition "at any time within ninety days after the cause of action accrues". Response thereto is required, investigation by the Secretary is authorized, and the Secretary may make an order directing the defendant to pay damages to the complainant. Failure to comply with the damage order entitles the complainant to seek court relief. Similarly, by § 310, 7 U.S.C.A. § 211, the Secretary under stated circumstances may prescribe reasonable rates or charges and determine what regulation or practice is reasonable and nondiscriminatory and issue orders requiring an owner or operator to cease and desist or to comply with those rates or charges and to observe the regulation or practice so prescribed. § 312, 7 U.S. C.A. § 213, is seemingly a catch-all section which declares it unlawful for any owner, market agency or dealer to "engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in connection with" the marketing of livestock in interstate commerce at a stockyard, and authorizes the Secretary to issue a cease and desist order with respect to any such violation. § 314, 7 U.S.C.A. § 215, provides for a monetary penalty for knowing failure to obey an order made under § 310 or § 312. § 315, 7 U.S.C.A. § 216, authorizes injunctive relief in the district court with respect to the failure of an owner, agency or dealer to obey any order of the Secretary other than for the payment of money.

The Act of December 29, 1950, as amended, 5 U.S.C.A. §§ 1031–1042, provides for review, with stated exceptions, by the courts of appeals of final orders of the Secretary.

Finally, § 308 of the Packers and Stockyards Act, 7 U.S.C.A. § 209, provides that if any owner, agency or dealer violates any provision of §§ 304–307 or any order of the Secretary under the Act, "he shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation" and may enfore that liability either by complaint to the Secretary under § 309 or by suit in an appropriate federal district court.

It is thus apparent that the Act and the supplemental legislation of 1950 embrace a comprehensive plan for the supervision of stockyards and market agencies by the Secretary, for the issuance of appropriate orders by him in this area, and for effective enforcement of those orders.

■ There are, however, two other pertinent provisions of the Packers and Stockyards Act not mentioned in the foregoing review. The first is an additional portion of § 308, cited supra, which provides in its subsection (b):

"* * * but this section shall not in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."

We read this in the knowledge that both the Sherman Act (1890) and the Clayton Act (1914) antedated the Packers and Stockyards Act (1921) and thus may be said to provide a remedy "now existing * * * by statute" which is not abridged or altered by the Packers and Stockyards Act. The second is § 405, 7 U.S. C.A. § 225, which reads:

"Nothing contained in this chapter, except as otherwise provided herein, shall be construed—

"(a) To prevent or interfere with the enforcement of, or the procedure under, the provisions of sections 1–13, 14–21, 22–27, * * * of Title 15 * * *, or

"(b) To alter, modify, or repeal such sections or any part or parts thereof * * *".

The Title 15 sections which are specifically referred to are the effective provisions of the Sherman and Clayton Acts and of the Wilson Tariff Act of 1894.

At first reading, therefore, § 308(b) and § 405 seem clearly to preserve for a plaintiff, in spite of involvement with the Packers and Stockyards Act, whatever rights he otherwise might have to seek initial and direct relief under the antitrust laws. It is at this point, consequently, that the impact of the doctrine of primary jurisdiction becomes important and must be considered.

2. *The Doctrine of Primary Jurisdiction.* The doctrine was first announced in Texas & Pacific R. Co. v. Abilene Cotton Oil Co., 1907, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553. That was a suit to recover freight rates claimed to be in excess of a reasonable charge. The court, through Mr. Justice White, later Chief Justice, recognized, p. 436, 27 S.Ct. p. 350, that at common law an action could be maintained for the recovery of any such excess; that, p. 439, 27 S.Ct. p. 350, the Interstate Commerce Act was intended to afford a means for the redress of wrongs resulting from unjust discrimination; that, p. 440, 27 S.Ct. p. 350, a uniform standard of rates was essential in order to prevent violations of the statute by way of discrimination; that, p. 442, 27 S.Ct. p. 356 "The independent right of an individual originally to maintain actions in courts to obtain pecuniary redress for violations of the act * * * must be confined to redress of such wrongs as can, consistently with the context of the act, be redressed by courts without previous action by the Commission * * *"; that, p. 446, 27 S.Ct. p. 357, the reservation clause of § 22 of the Act[3] "cannot in reason be construed as continuing in shippers a common-law right, the continued existence of which would be absolutely in-

consistent with the provisions of the act"; and that, p. 448, 27 S.Ct. p. 358, a shipper seeking reparation must "primarily invoke redress through the Interstate Commerce Commission * * *". The doctrine was thus originally grounded upon the Interstate Commerce Act's goal of uniformity.

The doctrine was redefined, but with different emphasis, by Mr. Justice Brandeis in Great Northern R. Co. v. Merchants Elevator Co., 1922, 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943. There it was said, p. 291, 42 S.Ct. p. 478:

> "Whenever a rate, rule, or practice is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the Commission. * * * It is required because the inquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the Commission. Moreover, that determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable, and such acquaintance is commonly to be found only in a body of experts."

In that case we have emphasis on technical matters, voluminous evidence, and the expertness of the reviewing administrative body.

This two-sided development of the doctrine was recognized and emphasized recently by the Supreme Court in United States v. Western Pac. R. Co., 1956, 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126:

> "The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies,

3. " * * * and nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies; * * *"

It is to be observed that this language is substantially identical with that of § 308(b), quoted above, of the Packers and Stockyards Act relative to the preservation of existing remedies.

is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. * * * 'Primary jurisdiction' * * comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. * * *

"No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question ,is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation. These reasons and purposes have often been given expression by this Court. In the earlier cases emphasis was laid on the desirable uniformity which would obtain if initially a specialized agency passed on certain types of administrative questions. * * * More recently the expert and specialized knowledge of the agencies involved has been particularly stressed. * * * "

See, also, United States v. Radio Corporation of America, 1959. 358 U.S. 334, 346–348, 79 S.Ct. 457, 3 L.Ed.2d 354.

The doctrine's rationale is perhaps well expressed in the following quotation from Far East Conference v. United States, 1952, 342 U.S. 570, 574–575, 72 S.Ct. 492, 94 L.Ed. 576, referring to an earlier case:

"The Court thus applied a principle, now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure."

The same approach appears in Federal Maritime Board v. Isbrandtsen Co., 1958, 356 U.S. 481, 497–498, 78 S.Ct. 851, 2 L.Ed.2d 926, and South Western Sugar & Molasses Co. v. River Terminals, 1959, 360 U.S. 411, 420–421, 79 S.Ct. 1210, 3 L.Ed.2d 1334. See Davis, Administrative Law Treatise, 1958, Vol. 3, Chapter 19 and, in particular, §§ 19.01, p. 3, 19.05 and 19.09.

How do these Supreme Court cases bear upon the Packers and Stockyards Act? It has been observed that there is a "close analogy" between that act and the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq. Stafford v. Wallace, supra, p. 522 of 258 U.S. p. 397 of 42 S.Ct. This court itself has stated that the latter "is patterned upon" the former. Sullivan v. Union Stockyards Co., 8 Cir., 1928, 26 F.2d 60, 61. It has been concluded, accordingly, that the doctrine of primary jurisdiction, which had its origin in transportation cases, may be invoked in proper cases arising under the Packers and Stockyards Act. See, for example, Kelly v. Union Stockyards & Transit Co. of Chicago, 7 Cir., 1951, 190 F.2d 860, 863 (concerning the removal of the plaintiffs from the defendant's "Open Order List"); Sullivan v. Union Stockyards Co., 8 Cir., supra, pp. 61–62 of 26 F.2d (concerning the necessity of an initial order by the Secretary for reparation for acts he found discriminatory); and United States v. Castner, N.D.Ill., 1953, 116 F.Supp. 475, 479. On the other hand,

the Seventh Circuit in its Kelly case, supra, has said, p. 864 of 190 F.2d:

"To say, however, that the primary jurisdiction doctrine is applicable to cases arising under the Packers and Stockyards Act is not to say that it applies to defeat the jurisdiction of the courts in all such cases, for the Supreme Court has clearly indicated that the doctrine is operative only in certain classes of cases, those in which 'the inquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the Commission.' Great Northern Ry. v. Merchants Elevator Co. * * * The decisive question, then, is whether this is such a case."

Judge Campbell necessarily used this same approach in United States v. Castner, supra, p. 479 of 116 F.Supp.

Similarly, the doctrine has found expression in antitrust cases. See, for example, Keogh v. Chicago & N. W. Ry. Co., 1922, 260 U.S. 156, 163, 43 S.Ct. 47, 67 L.Ed. 183; United States Navigation Co. v. Cunard S. S. Co., supra, 1932, 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408, and Far East Conference v. United States, supra, 1952, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576. But here again an area of non-application in antitrust cases is recognized. See United States v. R. C. A., supra, 1959, 358 U.S. 334, 347, 79 S. Ct. 457, 3 L.Ed.2d 354, and cases cited.

 We therefore conclude that although the doctrine properly may be invoked in certain antitrust litigation involving the Packers and Stockyards Act, it is not an inevitable barrier to court jurisdiction in all such cases.

 The plaintiff's suggestion that, because Livestock and Traders are separate legal entities under Nebraska law, citing R.R.S. of Nebraska 1943, Volume 2, § 25–313, and are not themselves amenable to the Packers and Stockyards Act,

the doctrine of primary jurisdiction is not applicable to these two defendants, does not persuade us. A like situation was present with respect to two of several defendants, one being a trade association and the other being a traffic conference comprising a part thereof, in Apgar Travel Agency v. International Air Trans. Ass'n, S.D.N.Y., 1952, 107 F. Supp. 706, and with respect to a defendant which was a voluntary association of steamship companies in Far East Conference v. United States, supra, and, although the point seems not to have been specifically passed upon in either case, the primary jurisdiction doctrine was applied in both. The individual members of Livestock and Traders are subject to the Packers and Stockyards Act and the purposes and application of the doctrine of primary jurisdiction are not to be defeated merely by naming the two unincorporated associations rather than its individual members as defendants.

 Neither does the fact that the Packers and Stockyards Act contains no provision declaring a conspiracy to restrain trade unlawful prevent the application of the doctrine. See Apgar Travel Agency v. International Air Trans. Ass'n, supra, p. 711 of 107 F. Supp. See Davis, Administrative Law Treatise, 1958, Volume 3, § 19.07(1).

Our task, therefore, in the case before us, is to determine, as was prescribed in United States v. Western Pac. R. Co., supra, p. 64 of 352 U.S. p. 165 of 77 S.Ct., "whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application" here.

Just as the Act, as we have noted above, on first glance seems to preserve for the plaintiff in all cases the right directly to seek the antitrust remedy he here claims, so do the alleged acts here complained of—the flip system and the pen cancellation—at first glance seem easily to fall within those provisions of the Act [4] which subject them to effective

4. §§ 301, 304, 307, 308, 309, 310, 312, 315, found, respectively, as 7 U.S.C.A. §§ 201, 205, 208, 209, 210, 211, 213 216.

regulation by the Secretary of Agriculture. But whether this serves to defeat or at least to delay this particular plaintiff's present action is our next inquiry.

We discuss separately in this connection the two bases of the complaint:

 1. The flip system. We conclude that, so far as the flip system shut out is concerned, the doctrine is not applicable to defeat the jurisdiction of the district court here.

The flip system described in the complaint, the related and perhaps identical turn system, and similar endeavors, have already been found by both the Secretary and the courts to constitute discrimination and to be violative of § 312(a) of the Packers and Stockyards Act. This court in broad terms said in Berigan v. United States, 8 Cir., 1958, 257 F.2d 852, 858–860:

"We think it obvious that any method, rule or scheme which limits the number of buyers or prospective buyers and thereby increases the value of the position or turn of those not eliminated must have the effect of restricting competition and necessarily results in depressing the whole market.

"The Judicial Officer's conclusion that the elimination of all but three dealers from a sales alley, thus limiting the number of prospective buyers, unreasonably restricts competition, is a sound conclusion, not contrary to law and one that is supported by substantial evidence in this record reviewed as a whole.

" * * * Any practice which results in dealers themselves determining in what sales alleys or in what order in a sales alley they shall bid is an unreasonable restriction on competition and the Judicial Officer must be upheld in his determination that the practice was a violation of § 312(a) of the Act * * *

"The conclusion is inescapable from the testimony brought out in the record that the *turn system was a combination* (dealers and Berigan)

formed for the purpose of controlling and buying and selling of livestock at the Berigan commission house—or contributed to that result. It is sufficient to resolve, as the Judicial Officer did, that it was a *combination* which unreasonably restricted competition, in violation of the Act. * * * "

Aikins v. United States, 10 Cir., 1960, 282 F.2d 53, is to the same effect. See, also, United States v. Swift & Co., D. Colo., 1943, 52 F.Supp. 476, 479, and Midwest Farmers v. United States, D. Minn., 1945, 64 F.Supp. 91, 98. We emphasize and repeat that in Berigan this court said that "any method, rule or scheme" which has the proscribed limiting result is discriminatory. The flip system thus already has achieved both an administrative and a court status of illegality. From this it follows (1) that the fact the present defendants were not parties to the Berigan litigation is of no consequence; (2) that there is no need for further administrative expertise on this issue; and (3) that the problem of uniformity, so often troublesome and persuasive in rate cases, is not present. The recognized bases of the primary jurisdiction doctrine are thus absent and, as was said in United States v. R. C. A., supra, 1959, 358 U.S. 334, 350, 79 S.Ct. 467, "The justification for primary jurisdiction accordingly disappears".

On this issue, therefore, the situation is akin to that of Great Northern R. Co. v. Merchants Elevator Co., supra, 259 U.S. 285, 42 S.Ct. 477, with respect to which the court recently said, in United States v. Western Pac. R. Co., supra, p. 69 of 352 U.S., p. 168 of 77 S.Ct.:

"We adhere to the distinctions laid down in Great Northern R. Co. v. Merchants Elevator Co., supra, which call for decision based on the particular facts of each case. Certainly there would be no need to refer the matter of construction to the Commission if that body, in prior releases or opinions, had already construed the particular tariff

at issue or had clarified the factors underlying it."

See, also, United States v. Union Pacific Railroad Company, S.D.Ia., 1959, 173 F.Supp. 397, 406, affirmed 362 U.S. 327, 80 S.Ct. 737, 4 L.Ed.2d 766, and Crancer v. Lowden, 1942, 315 U.S. 631, 62 S.Ct. 763, 86 L.Ed. 1077.

■ We observe, too, for what it is worth, that § 405 of the Act, 7 U.S.C.A. § 225, quoted supra, which preserves in specific words the remedies available under the Sherman and Clayton Acts, apparently is a provision peculiar to the Packers and Stockyards Act when contrasted with the other regulatory statutes generally associated with the primary jurisdiction doctrine. Although the section has been in the Act from its inception in 1921, it seems not to have been judicially construed. Its proper function, however, is discernible. It perhaps does not operate to deny the applicability of the doctrine of primary jurisdiction and its validity in proper cases; consistency may require that the section have no different effect than the saving clause embraced in § 308(b), 7 U.S.C.A. § 209. Its force, however, is in establishing specified areas as not being taken over exclusively by the Packers and Stockyards Act. In this respect it contrasts with the succeeding § 406, 7 U.S.C.A. § 227, which denies to the Federal Trade Commission power and jurisdiction over any matter placed by the Act under the jurisdiction of the Secretary of Agriculture. We thus find the Act much stronger in its language as to the preservation of antitrust remedies than, for example, is § 22 of the Interstate Commerce Act to which reference has been made above.

The reliance by the defendants on the Cunard case, supra, is, we think, misplaced. The Shipping Act involved there contained nothing comparable to § 405. Furthermore, § 15 of that Act, 46 U.S.C.A. § 814, expressly excepts conduct, such as that attacked in Cunard, held lawful under the Act, from the provisions of the antitrust statutes. No such exception exists here. See House Report No. 1048, 3 U.S.Code Congressional and Administrative News, pp. 5212, 5217, 85th Cong., Second Session, 1958. In this aspect, too, the Packers and Stockyards Act is different from certain of its fellow regulatory acts. Although this does not mean that the primary jurisdiction doctrine is avoided, it does imply that activity regulated by the Act must meet antitrust standards.

The defendants also argue that an antitrust action will not lie where the regulatory legislation provides an administrative remedy for the matters complained of; that under § 309, 7 U.S.C.A. § 210, the Secretary, upon a complaint, may even make an award of damages; and that this remedy is therefore exclusive. United States v. Alaska S. S. Co., W.D.Wash., 1952, 110 F.Supp. 104; Apgar Travel Agency v. International Air. Trans. Ass'n, supra, S.D.N.Y., 1952, 107 F.Supp. 706, 711, footnote 15; and S. S. W. Inc. v. Air Transport Ass'n, of America, D.C.Cir., 1951, 89 U.S.App. D.C. 273, 191 F.2d 658, cert. den. 343 U.S. 955, 79 S.Ct. 1049, 96 L.Ed. 1355, are cited. The first case, however, is another like Cunard, Far East and Isbrandtsen, involving the Shipping Act with substantial differences, referred to above, from the Packers and Stockyards Act. The last two cases concern the Civil Aeronautics Act of 1938, 49 U.S.C.A. § 401 et seq., which also contained nothing comparable to § 405 of the Packers and Stockyards Act specifically preserving antitrust remedies.

Furthermore, the kind of complaint to which § 309 has primary application impresses us as being different from the combinations and conspiracies embraced by § 1 of the Sherman Act and § 4 of the Clayton Act. § 309 extends to a particular violation, to one by a single defendant, and, seemingly, to all levels of impropriety under the Act. Its reach is more ordinary and routine than the specialized targets of the antitrust laws. We would be reluctant, therefore, to hold that this section supplants the long standing antitrust statutes in this area.

2. The pen cencellation. So far as the complaint concerns the additional element of Stockyards' cancellation of the plaintiff's pen assignment on June 21, 1957, we reach a contrary conclusion. While the cancellation is alleged to constitute a part of the antitrust violation, that determination to a large extent depends upon whether the cancellation in itself was discriminatory under the Act, that is, whether it constituted the denial to the plaintiff of "reasonable stockyard services" required by § 304, 7 U.S.C.A. § 205. In Sioux City Stockyards Co. v. United States, supra, N.D.Iowa, 1943, 49 F.Supp. 801, 804, a three judge district court said:

"We entertain no doubt that * * * the allocation of suitable, available pen space in the yards, to the market agencies entitled to operate at the stockyard are within the definition and prescription of sections 301 and 304 * * * and are therefore clearly within the supervisory authority of the Secretary of Agriculture, with a right on his part to determine whether the action of the stockyard company with respect to them has been unjust, unreasonable, or discriminatory."

Here, it seems to us, the primary jurisdiction doctrine has clear application. Questions involving the reach of the statutory words "discrimination" and "stockyard services", and the merit of a defense raised against a charge of discrimination, are matters for the Secretary's expertise and are properly assessed by him in the first instance. We feel, too, that the Seventh Circuit case of Kelly v. Union Stockyards & Transit Co. of Chicago, supra, 190 F.2d 860, although involving a "practice", is consistent with and authority for this conclusion.

The 90 day limitation of § 309, 7 U.S.C.A. § 210, need cause us no difficulty. Even if a direct application to the Secretary were barred, a question we do not now decide, the statute should not operate to prevent reference to the Secretary of a question raised by way of defense in a suit which is itself timely brought. See United States v. Western Pac. R. Co., supra, p. 71 of 352 U.S., p. 161 of 77 S.Ct.

We conclude accordingly that the court's refusal to assume jurisdiction of the complaint, so far as it concerns the cancellation of the pen assignment, was correct. This, however, raises the additional issue of whether dismissal of that claim was proper or whether the court should have retained jurisdiction pending proceedings before the Secretary. Dismissal, of course, is in order where a court is not in a position to grant relief, whatever the agency decides. See Keogh v. Chicago & N. W. Ry. Co., supra, 1922, 260 U.S. 156, 164, 43 S.Ct. 47, 67 L.Ed. 183. But where, because of limitation of the agency's power, further resort to the court is likely, the retention of jurisdiction has been deemed proper. See, for example, Thompson v. Texas Mexican R. Co., 1946, 328 U.S. 134, 151, 66 S.Ct. 937, 90 L.Ed. 1132. Compare, generally, Far East Conference v. United States, supra, 342 U.S. 570, 577, 72 S.Ct. 492, 96 L.Ed. 576; General American Tank Car Corp. v. El Dorado Terminal Co., 1940, 308 U.S. 422, 432–433, 60 S.Ct. 325, 84 L.Ed. 361; S. S. W. Inc. v. Air Transport Ass'n of America, supra, p. 664 of 191 F.2d. While, therefore, we are inclined to favor retention of jurisdiction on the pen cancellation issue, we nevertheless feel that that decision should be for the district court in the first instance and to be made in the light of our reversal on the flip issue.

Finally, we repeat and reemphasize (1) that this case has come to us in the posture of an appeal from the sustaining of the motions to dismiss and (2) that the well pleaded allegations of that complaint, for the narrow purposes of those motions, have been deemed admitted. Whether those allegations, under the demands of proof, will result in established violations of the antitrust statutes remains to be seen.

The judgment of the district court is vacated and the case is remanded for further proceedings consistent with this opinion.